UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

CRYSTAL BARKLEY, an individual,

               Plaintiff                            **COMPLAINT**

           -against-                        **Jury Trial Demanded**

AUDIENT CAPITAL GP LTD,
RICHARD J. BUCARIA (a/k/a RJ BUCARIA), and
DOES 1-10,
                         Defendants.

----------------------------------------------------------------X

       Plaintiff, by and through her attorneys of record, Moss & Byrnes PLLC, hereby alleges as follows:

## PRELIMINARY STATEMENT

       1.     This case is in one respect very simple: Defendant Audient Capital GP ("Audient") employed Plaintiff Crystal Barkley for approximately one year but never paid her, giving rise to breach of contract and wage and hour claims—claims as to which Defendants have acknowledged their liability.

       2.     Audient then terminated Plaintiff in retaliation for Plaintiff having sought to enforce her contractual and statutory right to be paid by filing an arbitration demand, which is the source of Plaintiff's wrongful termination claim.

       3.     Accordingly, Plaintiff is primarily seeking to be paid what she is owed by an employer that altogether failed to pay her for a year of work, and to be compensated for lost wages and emotional harm resulting from her wrongful termination.

4.      However, when Plaintiff repeatedly sought to be paid by Audient, it became increasingly clear that Defendants had entered into a contractual and employer-employee relationship with Plaintiff intending to *never* pay Plaintiff, thereby also giving rise to the common law fraud allegations set forth here.

5.      Further, Defendants' fraudulent conduct as to Plaintiff has been replicated on a broad, even international, scale with Defendant RJ Bucaria, Audient partner Marc Spillane, and perhaps other Doe Defendants infiltrating Audient and other entities to carry out a far-flung enterprise of fraud and racketeering targeting sophisticated Hollywood producers seeking investments in feature films, major event organizers needing loans, outside investors, and ordinary Audient employees like Plaintiff.

6.      The interconnected schemes include a fraudulent promise to invest $15.5 million in a Steven Speilberg-affiliated movie; luring outside investors with promises of extraordinary returns tied to the illusory $15.5 million movie investment; a "loan fee scam" directed at an Australian music festival; deliberately defaulting on arbitration awards, United States District Court judgments, and related settlement agreements; evading service of process; and failing to pay Plaintiff, a single mother, any of the wages she earned over the entire year that she worked for Audient.

7.      The foundation for Defendants' racketeering enterprise as alleged here was Audient's promised $15.5 movie million investment—a promise made with no intention of fulfilling it.  With documentation of the pledged investment in a legendary producer's movie, Defendants approached outside investors with the promise of extraordinary returns, returns  of 50% on investments of $1 million or more in a matter of mere months.  Defendants also exploited the prominence that the fraudulent movie investment afforded them to collect fees on promised

loans to other outside entities, entities that presumed Defendants' legitimacy based on their apparent business relationship with a Hollywood luminary. However, Defendants never actually made the $15.5 million investment; never paid outside investors their promised 50% returns (while keeping the capital those outside investors put up); and never made the promised loans (while keeping the up-front loan fees).

8.    Likewise, Defendants never paid Plaintiff at all for her year of work at Audient. Defendants did repeatedly assure the movie production company, outside investors, and loan recipients that they would fulfill their obligations "tomorrow" or "next week," and rebuffed Plaintiff with similar evasions, again and again, before abruptly firing her.

9.    In every instance, from the initial contracts Defendants entered into, to the barrage of false assurances that they would abide by those contracts via hundreds of interstate wire communications, Defendants has no intention of fulfilling any of these promises or subsequent assurances.

10.    Rather, Defendants, and principally Defendant RJ Bucaria, essentially stole from investors, loan applicants, and Plaintiff, in what was functionally a sprawling Ponzi scheme. But instead of paying off old investors with new, incoming money as in the usual Ponzi scheme, Bucaria and his co-conspirators apparently made off with all the incoming money, new and old, not even bothering to satisfy their relatively modest salary obligation to Plaintiff. When sued or taken to arbitration, Defendants default, absorb judgments, and then ignore the judgments. In at least one of those cases, Defendant Bucaria has assiduously avoided service of process, as he will likely do here.

11.    Accordingly, in addition to breach of contract, unpaid wages, wrongful termination, and common law fraud claims, Plaintiff also alleges that Defendants violated the Racketeer

Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1861 et seq. by engaging in wire fraud over many years and across multiple businesses in furtherance of the illegal scheme.

12.    Plaintiff is currently owed damages, penalties, interest, attorneys' fees, and costs related to her wage and hour claims, and by this action is seeking treble damages in connection with her RICO claims, as well as punitive damages arising from her common law fraud claims.

13.    In total, Plaintiff is seeking a judgment against Defendants in excess of $5,000,000.

## **PARTIES**

14.    Plaintiff Crystal Barkley is an individual who resides in Florida.

15.    Plaintiff is informed and believes, and on that basis alleges, that Defendant Audient Capital GP Ltd. is based in Australia, although the Audient Capital website[1] indicates that it can be contacted at: c/o Stuarts Corporate Services Ltd., Kensington House, 69 Dr. Roy's Drive, George Town PO Box 2510, Grand Cayman KY1-1104, Cayman Islands.

16.    Defendant Richard J. Bucaria is an individual who, on information and belief, resides in Oceanside, New York.

17.    Plaintiff is ignorant of the true names and capacities of the defendants sued herein as Does 1 through 10, and therefore sues these defendants by such fictitious names. Plaintiff will amend the Complaint to allege the true names and capacities of the Doe defendants when they have been ascertained.

---

[1] *See* https://audientcapital.com (last visited Dec. 29, 2024).

### NON-PARTIES PARTICIPATING IN THE RACKETEERING ENTERPRISE

18.     Mark Spillane is an individual who, on information and belief, resides in Australia and is a partner of Defendant Audient.

19.     Plaintiff is informed and believes, and on that basis alleges, that Upsense Media Capital Pty. Ltd. is a purported Australian business entity whose form is otherwise unknown, located in Sydney, New South Wales, Australia.  Plaintiff is informed and believes that, in actuality, Upsense is corruptly used and controlled by Defendant Bucaria and other co-conspirators in the racketeering scheme alleged herein to solicit investments from individuals and entities purportedly in connection with motion picture investments.  Defendant Bucaria has held himself out as the Managing General Partner of Upsense.

20.     Defendant Bucaria has also held himself out as the CEO and co-founder of Prolific Media Holdings, LLC, a Delaware limited liability company, with its principal place of business in New York, New York.  Plaintiff is informed and believes, and on that basis alleges, that Defendant Bucaria purports to operate Upsense as Prolific's investment fund.

21.     Plaintiff is unaware of where, or under what laws, Audient Global Investment Fund I LP was formed and currently exists.  Plaintiff is informed and believes, and on that basis alleges, that Audient Global Investment Fund I LP is based in the Cayman Islands and has been infiltrated by Defendant Bucaria and co-conspirators in the racketeering scheme alleged herein to carry out that enterprise.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 based on Plaintiff's claims for violation of RICO, 18 U.S.C. §§ 1861-68.

23.     This Court also has subject-matter jurisdiction over this matter based on complete diversity of citizenship under 28 U.S.C. § 1332(a)(2).  Plaintiff resides in Florida, Defendant Bucaria resides in New York, and Defendant Audient's principal place of business is Australia or, alternatively, the Cayman Islands.

24.     This Court has supplemental jurisdiction over Plaintiff's New York State wage and hour, wrongful termination, contract, and fraud claims pursuant to 28 U.S.C. § 1367.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims occurred within the Southern District of New York.

26.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to this Court by regularly transacting business in the State of New York and/or by purposely availing himself of the jurisdiction of this Court for the specific transactions at issue and/or by contractually consenting to personal jurisdiction in New York State.

## FACTUAL ALLEGATIONS

27.     Plaintiff has built a more than 20-year career in sports, entertainment, and investment.

28.     Plaintiff had crossed paths with Defendant RJ Bucaria in business in the years prior to the events pertinent here.  In or about February of 2023, Bucaria phoned Plaintiff and described the prospect of Plaintiff working for Audient.

29.     On September 15, 2023, Plaintiff was hired by Audient as its Director of Investor Relations.  Plaintiff's starting day was originally to be September 15, 2023, though Plaintiff's starting day at Audient was purportedly deferred to October 1, 2023.

30.     On October 2, 2023, Audient formalized its employment relationship with Plaintiff by way of an email from Defendant RJ Bucaria to Plaintiff that read as follows:

> **From:** RJ Bucaria <rj.bucaria@audientcapital.com>
> **Sent:** Monday, October 2, 2023 10:40 AM
> **To:** Crystal Barkley <crystal.barkley@audientcapital.com>
> **Subject:** Employment agreement
>
> Morning Crystal,
>
> Agreement and NDA are attached, please countersign both and return
> when you have a moment.  So happy to have you on board!
>
> RJ Bucaria
> Managing General Partner
> Audient Capital
> www.audientcapital.com

31.     The employment agreement between Plaintiff and Audient, a true and correct copy of which is attached as Exhibit A ("Employment Agreement"), was an attachment to Bucaria's October 2, 2023 email to Plaintiff.

32.     The Employment Agreement contains the following provisions:

- a term of September 15, 2023 through September 14, 2026 (Empl. Agr. §2);

- a base salary of $120,000 (first year), $126,000 (second year), and $132,000 (third year) (Empl. Agr. §3(i)a-b);

- an annual bonus of 50% of base salary for the previously completed fiscal year, to be distributed within 60 days of December 31, irrespective of "whether or not the Employee is employed by at the time any such payments earned are actually paid" (Empl. Agr. §3(ii));

- a 10% Investor Relations Bonus in connection with Plaintiff generating management fees by introducing investors to Defendants Bucaria and Audient (Empl. Agr. §3(ii));

- a three-month severance payment if Defendants unilaterally terminate Plaintiff's employment, payable to Plaintiff within 30 days of termination (Empl. Agr. §6(b);

- an arbitration clause whereby the parties agreed to arbitrate disputes before the Manhattan, New York office of the American Arbitration Association (Empl. Agr. §12); and,

- a choice of law clause providing that "THIS AGREEMENT WILL BE GOVERNED BY THE LAWS OF NEW YORK STATE" and a mutual consent to personal jurisdiction in New York state and federal courts (Empl. Agr. §13(a).

**33.** When Plaintiff began her job as Audient's Director of Investor Relations, Defendant Bucaria informed Plaintiff that she would be paid on the 15th and the final day of each month.

34.     Despite her first day at Audient having been purportedly deferred from September 15 until October 1, 2023, the Employment Agreement between Plaintiff and Audient did not alter her start date.  Accordingly, Plaintiff was first due to be paid on September 30, 2023.

35.     Plaintiff was not paid on September 30, 2023.

36.     The next date on which Plaintiff was due to be paid was October 15, 2024. Again, Plaintiff was not paid by Audient.

37.     On October 19, 2023, Plaintiff sent a lengthy email addressed to both Defendant Bucaria and Audient partner Mark Spillane, seeking further information concerning why she had now not been paid now for two consecutive pay periods:

> **From:** Crystal Barkley
> **Sent:** Thursday, October 19, 2023 5:30 PM
> **To:** Mark Spillane; RJ Bucaria
> **Subject:** Follow-up
>
> Hi Mark and RJ-
>
> Hope you have a good morning and RJ you had a good afternoon.  I wanted to reach out because I am a little concerned. The link for the transfer for payroll has not been received by RJ yet.
> I was depending on payroll last Friday, October 13.
> From my understanding it has to take a day or two to get in the system and then he would receive the transfer approval link by early this week.
>
> I have tried not to mention it but I am little concerned about it.
> The beginning of September, I walked away from a contract, when the offer letter stated starting September 15, 2023.  I was told I would be on that following biweekly payroll for September 29.  When things didn't seem to go, I reached out to RJ and was advised it was decided I would just start October 1. I was ready and eager as I am the only sole provider for my family.
>
> I did reach out to RJ on September 30 concerned when payroll would start as bills were due first of the month and just needed a game plan as I am sure everyone can understand.
> When I received the email Friday morning to fill out the W9, it was completed and provided my banking information so it could be transferred that day ( I guess I misunderstood). I was praying things would arrive by yesterday.  I did send RJ a text last evening after our call and touched base with him. He must be in meetings all day today.  So sorry to have to ask you and RJ again.  It's an uncomfortable conversation. We are a team so we all need to be able to rely one

another- I am just needing to take care of family and I have already
missed a month of pay leaving my last contract.

Please let me know if there is anything I can do to help with that-

Also, Christina got me into the system on Opus. I asked her to provide
me the PDF.  She sent the link for the subscribers to access the
PDF.  Justin and Trevor might find that easier. Log in was successful
for Monday.

Word is getting around that I have joined the group.  Once that PR
lease is approved, I would like to change my LinkedIn and attach
it.  My network is very powerful and we could benefit from the traction
of the announcement. My son is heading over for dinner this evening
but I will keep checking my messages.  I felt bad texting RJ again about
this so thought I would just send an email.

Thank you both!


Crystal L Barkley
Director of Investor Relations
Audient Capital
www.audientcapital.com

**38.**    Over the subsequent months, Audient never paid Plaintiff.

**39.**    Plaintiff repeatedly raised the issue of her not being paid to Defendant Bucaria

and others at Audient.

**40.**    When Bucaria did respond, it was to offer one of three standard excuses:  1)

Audient was experiencing problems with its payroll company; 2) Audient was awaiting a transfer

from its General Counsel's escrow account; or, 3) Audient was awaiting funds from investors.

**41.**    Bucaria would also typically assure Plaintiff that her being paid was imminent,

telling her she would be paid "tomorrow" or "next week."  Audient partner Mark Spillane would

make similar assurances to Plaintiff.

**42.**    However, none of these claimed impediments to paying Plaintiff were ever

resolved across the more than 20 pay periods that Audient failed to pay Plaintiff.  There was

always a new excuse.

43.     Then, when Plaintiff tried to enforce her right to be paid under her Employment Agreement with Audient by filing an arbitration demand, Audient ignored the arbitration demand, and fired Plaintiff in retaliation for her having attempted to enforce her rights under the Employment Agreement.

44.     The first time Plaintiff wasn't paid, Defendant Bucaria responded to Plaintiff's email inquiring as to why.  In an October 19, 2023 email from Bucaria to Plaintiff, Bucaria attributed the failure to pay Plaintiff to administrative issues with Audient's payroll company. Bucaria assured Plaintiff that he would "get on the phone and make sure that it is done so you can proudly be the provider your family needs and I can feel better about you being properly compensated for the amazing job you have been doing for us thus far":

> **From:** RJ Bucaria <rj.bucaria@audientcapital.com>
> **Sent:** Thursday, October 19, 2023 8:02 PM
> **To:** Crystal Barkley <crystal.barkley@audientcapital.com>; Mark Spillane <mark.spillane@audientcapital.com>
> **Subject:** RE: Follow-up
>
> Hey Crystal,
>
> My apologies for not getting back to you sooner.  You are correct and know me all too well that when I don't respond I'm usually just slammed.  That said, regarding the payroll set up we do sincerely apologize for the delay especially when some of the issues have been totally on us like the W9 and account set up.  Being busy on our part isn't a good excuse for allowing important items like this to fall through the cracks and create delays especially around items like receiving payroll.  In the event that your onboarding hasn't been completed in the morning, I will get on the phone and make sure that it is done so you can proudly be the provider your family needs and I can feel better about you being properly compensated for the amazing job you have been doing for us thus far.
>
> RJ Bucaria
> Managing General Partner
> Audient Capital

45.     A day later, on October 20, 2023, Plaintiff emailed Bucaria, asking him, "Any update?"  Bucaria did not respond.

46.     Plaintiff was again not paid on the October 31, 2023 payday.

47.     Plaintiff emailed Defendant Bucaria and Audient partner Mark Spillane early on the morning of October 31, 2023, once again seeking to find out why she hadn't been paid, and whether she would be paid on the scheduled payday:

> From: Crystal Barkley <crystal.barkley@audientcapital.com>
> Date: 10/31/23 1:12 AM (GMT-05:00)
> To: RJ Bucaria <rj.bucaria@audientcapital.com>, Mark Spillane
>   <mark.spillane@audientcapital.com>
> Subject: Re: Follow-up
>
> Hi, RJ, and Mark-
>
> Did you happen to get any updates on the pay situation? I was hoping the
> bank was able to provide answers today why the template isn't working
> for the pay transfer still? Mark I know you were going to try to find out
> last night.
>
> I couldn't sleep so I wanted to reach out. Is everything okay?
>
> Crystal

48.     While Spillane did not respond, on October 31, 2023 Defendant Bucaria did email Plaintiff with the assurance that "I have a call today at 2pm w them to try to get this fixed. I'll give you a call as soon as im[sic] off, hopefully with this being finally resolved."

49.     Nothing was resolved.  Eight days later, on November 7, 2023, Plaintiff again inquired to Bucaria about when she would finally be paid:

> **From:** Crystal Barkley <crystal.barkley@audientcapital.com>
> **Sent:** Tuesday, November 7, 2023 11:02 AM
> **To:** RJ Bucaria <rj.bucaria@audientcapital.com>; Mark Spillane
> <mark.spillane@audientcapital.com>
> **Subject:** Re: Follow-up
>
> Hi RJ-
>
> Can you kindly please let me know about payroll?
>
> Hope all is okay-
>
> Crystal

50.     On November 15, 2023, Defendant RJ Bucaria told Plaintiff during a telephone call that Audient was in legal possession of "funds" that simply needed to be transferred into the Audient payroll account, that the transfer would happen shortly, and that Plaintiff would be fully paid.

51.     When that didn't happen, Plaintiff contacted Audient partner Mark Spillane through WhatsApp, describing the situation as follows in a November 15, 2023 message:

> RJ said the banking wasn't transferred for payroll again today. Do you think tomorrow it will be settled? Just hoping it will be. I am the sole provider for my daughter so I am doing the best I can until the check from the bank arrives to RJ for the previous two payrolls and now the payroll transfer today.

52.     Nearly a week later, having received no response from Spillane, Plaintiff again contacted him through this November 21, 2023 WhatsApp message: "I just wanted to reach out. Is everything okay? I didn't hear back from you and I haven't heard from RJ since last week."

53.     Nine days later, on November 30, 2023, Mark Spillane finally responded to Plaintiff on WhatsApp: "RJ asked me to reach out as he's offline for a while. Update on our pays—have the bank working on providing us access to funds next week."

54.     Plaintiff was not paid "next week." Nor was she paid on any of the November or December 2023 paydays.

55.     Even so, throughout November and December of 2023, Plaintiff continued her work as Audient's Director of Investor Relations, and in that capacity encountered Audient investors concerned that they, too, had not been receiving promised payments that were contractually due to them.

56.     The outside investors had received  excuses similar to what Plaintiff had been told by Defendant RJ Bucaria: that various "funding" had been transferred to Audient, but it was in

an escrow controlled by Audient's General Counsel.  Bucaria assured both the Audient investors and Plaintiff that the funds' release from escrow was imminent, and that all would be fully paid.

57.     However, this ruse continued over many months, with neither the Audient investors being paid what they were owed nor Plaintiff being paid for her work under the Employment Agreement between her and Audient.

58.     By January of 2024, Plaintiff had been working as Audient's Director of Investor Relations without pay for over three months.  Plaintiff communicated her financial and mental distress to Bucaria in a January 15, 2024 WhatsApp message:  "Are you available—I am not doing well . . . I have cried all morning and pretty much all weekend."

59.     Bucaria responded to Plaintiff that same day via WhatsApp, claiming that the funding necessary to pay Plaintiff would arrive "tomorrow":

> Look, I've got some positive news for you this week.  While taking a few days longer than expected, I should have everything wrapped up with this project on the prolific side by tomorrow

60.     In a continuation of the same WhatsApp exchange between Plaintiff and Bucaria, on January 16, 2024 Bucaria indicated that he would "formally introduce" Plaintiff to Audient General Counsel Randolph Mendelsohn.  Multiple times, Bucaria had told Plaintiff that she would be paid when the necessary funds "cleared [Mendelsohn's] escrow account."  In fact, Plaintiff was never introduced to Mendelsohn.  Plaintiff is informed and believes, and on that basis alleges, that Bucaria had no intention of actually introducing Plaintiff and Mendelsohn and facilitating their direct communication, because if Bucaria had done so, he would have exposed his repeated fabrication that the funding necessary to pay Plaintiff would soon "clear" the escrow account, when in fact there was no such funding.

61.     Plaintiff was not paid on either of the January 2024 paydays.

62.     Following repeated promises from Bucaria that she would be paid imminently, on February 8, 2024, Plaintiff inquired by text to Bucaria about the timing of the payment so that she could afford and schedule her treatments for Lupus:



63.     A week later, on February 15, 2024, Bucaria once again assured Plaintiff that she would be paid "tomorrow":



64.     Then, on February 20, 2024, Bucaria purported to confirm that the funds necessary to pay Plaintiff had been transferred to Audient, but were in Audient's General Counsel's escrow account:



**65.**    Then, the next day, a Wednesday, February 21, 2024, Bucaria again assured

Plaintiff that the funds would clear the escrow account, and that Plaintiff would be paid

"tomorrow," a Thursday, or Friday at the latest:



66.    Thursday passed, as did Friday, and still not having been paid, Plaintiff inquired

with Bucaria yet again on Monday, February 26, 2024.

67.    This time, Defendant Bucaria shifted his excuse from awaiting payment out of the

escrow account to what he claimed to be imminent payment to Audient from an investor named

"Daniel":



68.    As with all the other times that Bucaria promised to take heroic measures to get Plaintiff paid, Bucaria seemingly did not "go to Wisconsin," and Plaintiff was not paid throughout February of 2024, her fifth uncompensated month working for Audient.

69.    March 15, 2024 also passed without Plaintiff being paid, but in a March 27, 2024 WhatsApp message, Bucaria yet again assured Plaintiff everything would be resolved "in the next day or so."

70.    Facing possible eviction, medical bills, and single-handedly raising her young daughter, Plaintiff responded, "I don't have a day or two."

71.    Also in March of 2024, Audient investors were being told a similar story: that the funds necessary to pay them their contractually owed disbursements were in the Audient General Counsel's escrow account and would be presently issued. For instance, in a March 28, 2024 WhatsApp exchange between an Audient investor and Audient's General Counsel Mendelsohn, Mendelsohn himself assured the investor--seemingly based on false assurances he had received from Bucaria--that "I checked with RJ and we are expecting the admin to be completed this week, but given the holiday weekend we should be ready to disburse the funds by next week. I have already received the instructions to disburse the $300k once the funds have cleared to my

escrow." The investor responded skeptically: "Ok. Banks are open on Friday. So not understanding the delay."

72.     Similar false assurances to Plaintiff, from both Bucaria and Spillane, persisted throughout April and May of 2024.

73.     In an April 2, 2024 WhatsApp message to Plaintiff, Bucaria referenced a "Danny" and a supposedly imminent infusion of capital to Audient:

> Spoke with Danny. He is set to draw down on the credit facility tomorrow. Depending on timing of when funds clear to their account, they will be wiring to us tomorrow or first thing Thurs morning.

74.     Once again, however, Plaintiff was not paid either "tomorrow," the following day, or at all.

75.     And after that promised deadline passed, still another arose, as set forth in Bucaria's April 5, 2024 WhatsApp message to Plaintiff:

> [S]upposedly Danny pulled funds from the credit facility today to their account. He's calling me tomorrow to confirm all went well and if so get funds access to us for Monday or Tuesday.

76.     The purported funding transfer facilitated by "Danny" never materialized, however, and Plaintiff was again not paid on the May 1, 2024 payday.

77.     In or about this time, Plaintiff had been told by Bucaria that a $55 million payment from investors was due to be made to Audient, and that as soon as that money was in the Audient escrow account, Plaintiff would be paid.

78.     Audient partner Mark Spillane was also giving Plaintiff assurances similar to Bucaria's regarding this purported $55 million investment and the escrow account.

79.     In a May 8, 2024 WhatsApp message to Plaintiff, Plaintiff asked Spillaine, "Are you communicating with Randy [Mendelsohn] the attorney yourself? RJ said it was because

Randy was unable to make it to the bank due to his other clients and depositions.  So are we actually waiting for the 55 m to clear?"  Spillane responded, "As far as I know yes, but I do know that Randy has been busy too.  I'll get update."

80.    In the same WhatsApp exchange on May 8, 2024, Plaintiff asked Spillane, "Can you let me know what is the hold up on the funds being on hold in Randy's escrow?  . . .  Do we know when it will be wired?"  Spillane responded: "Next few days is my guess."

81.    Plaintiff pressed Spillane: "Why doesn't anyone know as it sits in the attorneys escrow?  Do you find this odd?  What is the hold up?"  Spillane responded, "Because the attorney is waiting on the funds to be cleared."

82.    No funds were "cleared."  Plaintiff was again not paid on the May 15, 2024 payday.

83.    In a May 15, 2024 WhatsApp message to Plaintiff, Spillane told Plaintiff, "Should have a positive [update] for you tomorrow—hit me back tomorrow we should be ok."

84.    Plaintiff responded to Spillane on May 15, 2024, via WhatsApp, explaining to him that Bucaria had told Plaintiff that all that remained was for Audient's General Counsel to wire the money out of his escrow account, and describing her desperate financial situation, now having gone nearly nine months without having been paid by Defendants:

> [Y]esterday [RJ] told me that Randy [Mendelsohn] was headed to the bank to wire and it never arrived.  RJ was gong [sic] to find out why.  I have no family except my children and our rent is past due.  They will kick us out so I told them yesterday it was arriving, I just want to make sure everything is okay but certain things don't make sense.  Not understanding why Randy would never wire.  Just want to make sure all is okay.  I almost feel as if the wire never happened to escrow.

85.    In response to Plaintiff having expressed to him that her not being paid had caused her to be threatened with eviction, on May 21, 2024 Defendant Bucaria wrote a letter to

Plaintiff's landlord, confirming her employment with Audient, the three-year term of her

employment, that she was immediately due $93,000 in wages, and that she would be paid on

May 28, 2024:

> Ms. Lopez,
>
> I am writing this letter on behalf of Ms. Crystal Barkley at her request. Please be advised that I am happy to confirm that Ms. Barkley is employed as the Director of Investor Relations of our Audient Capital private equity firm. Her current contract term is a three-year term which began in September of 2023. With Ms. Barkley's permission I can also confirm to you that she is currently due to receive a payment in the amount of $93,000 USD related to her employment with the firm and I can also confirm that the payment is scheduled to be released to her account on Tuesday May 28th 2024. Please feel free to reach out to me at any time if you have additional questions at 516.427.4640.
>
> Sincerely,
>
> RJ Bucaria
> General Partner
> Audient Capital GP Ltd

May 21, 2024 Bucaria Ltr., Exh. B.

86.     The promised May 28, 2024 payment to Plaintiff was never made.

87.     Consequently, Plaintiff and her daughter were forced to vacate their rented house

as their management company did not renew Plaintiff's lease. Plaintiff only avoided eviction by

borrowing money to pay the final month's rent. Without money to make a deposit on a new

rental, Plaintiff and her daughter were on the verge of homelessness when a friend allowed them

to temporarily live on their property.

88.     It was at around this time that Plaintiff's broader suspicions about Defendants

Audient and Bucaria were validated. Plaintiff discovered that others had been identically

deceived.

89.     For instance, in *Storyeller Production Co., LLC v. Audient*, No. 2-24-cv-01864 (C.D. Cal. filed May, 28, 2024), the plaintiff alleged that Bucaria and Audient had promised to make a $15.5 million investment in a film connected with Steven Speilberg's production company.  When the promised investment from Audient didn't arrive, the plaintiff made multiple inquiries, and Bucaria invariably responded, as with Plaintiff, that the promised payment was imminent, and in some instances that it would be completed "tomorrow."  After months of Bucaria's evasions, the plaintiff initiated an arbitration against Audient, an arbitration that resulted in a $15.5 million award against Audient.  When Audient showed no signs of paying the arbitration award, the plaintiff petitioned for an order confirming the arbitration award in the Central District of California.  Audient stipulated to a judgment in that action, but defaulted on the stipulation, and the *Storyteller* plaintiff is pursuing collection of the now more than $15.5 million stipulated judgment.

90.     In *Apex Entertainment v. Audient Global Inves. Fund I, LP & Richard J. Bucaria*, (N.Y. Supr. Ct. No. 612247/2024), the plaintiff alleged that Audient and Bucaria had agreed to loan the plaintiff over $6 million to finance an Australian music festival.  The plaintiff paid considerable up-front loan fees to Audient, and in reliance on Bucaria's assurances that the loans would be funded, extensively planned the music festival.  However, when the time came for the loans to be disbursed to the plaintiff, Audient and Bucaria once again delayed and deflected, ultimately never making the promised loan to the plaintiff while keeping the loan fees.  The case is still at the pleading stage in New York State court, with no Answer having yet been filed because RJ Bucaria has thus far evaded service.  A motion to deem Bucaria served by substitute service has been briefed and argued and a ruling on that motion is pending at the time of this Complaint's filing.

91.     In *Island Stars 21 Inc. v. Bucaria, et al.* (N.Y. Supr. Ct. No. 657063/21), the plaintiff corporation alleged that it had been defrauded by Bucaria through his infiltration of a company called Upsense Media Capital Pty. Ltd. ("Upsense"), and in connection with Audient's fraudulent promise to invest in the movie that is the subject of the *Storyteller* case.  Specifically, the plaintiff was promised a $500,000 return on a $1,000,000 investment, with an extraordinarily short turnaround time, but the plaintiff received neither the promised $500,000 return nor its original $1,000,000 principal payment.  It is alleged that Bucaria and his co-defendants took the plaintiff's investment money with no intention of making good on the parties' agreement.

92.     Buraria ran another similar scheme through Upsense as alleged in *Hudson Private Corp. v. Upsense, et al.* (L.A. Super. Ct. No 21-st-civ-1-3940), with Bucaria having solicited a $2.5 million investment from the plaintiff with the promise of a fast $1 million return.  The *Hudson* plaintiff alleges that

> Bucaria utilizes Upsense to operate a fraudulent scheme (similar to a Ponzi scheme) whereby Bucaria lures potential investors into entering into various investment deals for ulterior and undisclosed purposes and then uses investment funds for improper purposes, including for his personal benefit and to repay prior financing parties, with no intention of actually performing on the promises made to the investors, including Hudson.

Hudson Compl., ¶ 6.

93.     The same pattern is replicated in this case, as throughout May and June of 2024, Bucaria continued to assure Plaintiff that that the funds necessary to pay her would soon be available.

94.     In this May 13, 2024 text message to Plaintiff, Bucaria claimed that he merely needed to "confirm" that the funds were available:



95.     In this June 13, 2024 text message, Bucaria was making the same essential claim to outside Audient investors: that the funds were available, in an escrow account, and would be paid out "next Friday":



96.     For his part, Audient's General Counsel, Randy Mendelsohn, never represented to Plaintiff (or anyone apparently) that he was actually in possession of any funds, in his escrow account or otherwise.  Rather, Bucaria and Spillane periodically invoked "Randy's escrow account" as a fabricated impediment to Audient making good on its financial commitments, to Plaintiff and numerous others.

97.     On learning that others had been similarly defrauded, and that some recognized that they had choice but to resort to litigation, Plaintiff did the same.

98.     Consistent with the arbitration clause in her Employment Agreement with Audient, Plaintiff filed an arbitration demand in the Manhattan office of the American Arbitration Association on July 10, 2024, paying all required fees.

99.     Audient, however, altogether ignored the arbitration demand, and failed to pay its required fees, though Defendant Bucaria did respond negatively to Plaintiff 's having filed the arbitration demand.  In text messages with Plaintiff, Bucaria claimed that, by filing the arbitration demand, Plaintiff had opted to be adversarial, and thereby somehow derailed a cordial process among friends in which she would have inevitably been paid.

100.    On July 25, 2024, the AAA dismissed the arbitration because of Defendants' failure to have paid their required fees.

101.    In communications with Plaintiff's counsel, written and by phone, Audient's General Counsel indicated that he was not authorized to accept service for either Audient or RJ Bucaria were Plaintiff to file an action in state or federal court in New York, as provided for in Plaintiff's Employment Agreement with Audient.

102.    During this time, Plaintiff remained employed by Audient.  In the following text exchange from August 13, 2024 between Plaintiff and Defendant Bucaria, Bucaria acknowledges the now-dismissed arbitration and assures Plaintiff that she would be paid "by the end of next week":



103.    Plaintiff was not paid "by the end of next week."

104.    Rather, only weeks after this latest assurance from Bucaria, Plaintiff was abruptly fired by Audient, seemingly in retaliation for having filed the arbitration action that Audient and Bucaria never responded to but were plainly aware of.

105.    On September 2, 2024, in a letter signed by Defendant RJ Bucaria and three other Audient general partners (Mark Spillane, Kristie Spillane, and Jason Goldstein), Plaintiff was terminated by Audient.  Attached as Exhibit C is a true and correct copy of the September 2, 2024 letter from Audient to Plaintiff.

106.    Neither at her termination nor since has Plaintiff been paid the salary, bonus, or severance payments owed to her under the Employment Agreement with Audient.

## CAUSES OF ACTION

### First Cause of Action—Against Defendants Bucaria and Audient
### (RICO 18 U.S.C. §§ 1862)

107.    Plaintiff hereby realleges and incorporates the allegations of each foregoing paragraph.

### *Overview: RICO Allegations*

108.    **The Unlawful Racketeering Activity.**  Defendant Bucaria, in concert with Defendant Audient and Audient partner Mark Spillane, repeatedly committed wire fraud pursuant to 18 U.S.C. § 1343 through a pattern of racketeering, principally by the corruption of Audient Capital GP Ltd.  Bucaria, Audient, and Spillane committed such predicate acts willfully and with actual knowledge of the illegal activities.  Specifically, and as is set forth herein, Bucaria, Audient, and Spillane repeatedly and intentionally used interstate wire communications to make fraudulent promises without intending to fulfill those promises.  As a proximate cause of Bucaria's, Audient's, and Spillane's acts, Plaintiff has been injured, as have numerous other individuals and entities.

109.    **Culpable Persons.**    Bucaria, Audient, and Spillane  are "persons" within the meaning of 18 U.S.C. § 1361(3) and § 1962 (c) in that each is an individual capable of holding a legal interest in property.  At all relevant times, Bucaria, Audient, and Spillane were, and are, persons existing separately from the Enterprise described below.  Bucaria, Audient, and Spillane agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding Plaintiff, as well as numerous other persons and entities.

110.    **The Enterprise.**        Bucaria, Audient, and Spillane constitute an Enterprise within the meaning of 18 U.S.C. § 1361(4) and § 1962 (c).  Bucaria, Audient, and Spillane are

associated in fact and through relations of ownership for the common purpose of carrying on an unlawful Enterprise. Specifically, the Enterprise has a common goal of making fraudulent promises and soliciting funding with the common intention of not fulfilling the Enterprise's fraudulent promises. Since at least 2021 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel, and/or one or more contracts or agreements relating to and for the purpose of defrauding investors, business entities, and employees of Audient. The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. § 1343, which is "racketeering activity" as defined by 18 U.S.C. § 1961(1). Pursuant to and in furtherance of their fraudulent scheme, Bucaria, Audient, and Spillane committed multiple acts of interstate wire fraud.

111. **Pattern of Racketeering**. The Enterprise's repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) and § 1962(5).

112. **Interstate or Foreign Commerce**. The Enterprise's predicate acts and racketeering activity affect interstate and foreign commerce.

113. **Injury**. Plaintiff is a "person" who has sustained injury to her person and property "by reason of" the Enterprise's violation of 18 U.S.C. § 1962.

### *RICO Allegations as to Plaintiff*

**114.** On September 15, 2023, Plaintiff was hired by Audient as its Director of Investor Relations.

**115.** On October 2, 2023, Audient formalized its employment relationship with Plaintiff by entering into the Employment Agreement (Exh. A).

116.    To induce Plaintiff to enter the Employment Agreement, Defendants Bucaria and Audient made material misrepresentations and false promises to Plaintiff, including:

- a term of September 15, 2023 through September 14, 2026 (Empl. Agr. §2);

- a base salary of $120,000 (first year), $126,000 (second year), and $132,000 (third year) (Empl. Agr. §3(i)a-b);

- an annual bonus of 50% of base salary for the previously completed fiscal year, to be distributed within 60 days of  December 31, irrespective of "whether or not the Employee is employed by at the time any such payments earned are actually paid" (Empl. Agr. §3(ii));

- a 10% Investor Relations Bonus in connection with Plaintiff generating management fees by introducing investors to Defendants Bucaria and Audient (Empl. Agr. §3(ii));

- a three-month severance payment if Defendants unilaterally terminate Plaintiff's employment, payable to Plaintiff within 30 days of termination (Empl. Agr. §6(b); and,

- an arbitration clause whereby the parties agreed to arbitrate disputes before the Manhattan, New York office of the American Arbitration Association (Empl. Agr. §12).

117.    Plaintiff was first due to be paid on September 30, 2023.  She was not.  Nor was Plaintiff paid over the entirety of her employment.

118.    The failure to pay Plaintiff was part of the racketeering Enterprise alleged here, exemplified by Bucaria, Audient, and Spillane repeatedly giving false assurances to Plaintiff that she would be paid imminently:

- On October 19, 2023, and Plaintiff sent a lengthy email addressed to both Defendant Bucaria and Audient partner Mark Spillane, seeking further information concerning why she had not been paid for two consecutive pay periods.

- In an October 19, 2023 email from Bucaria to Plaintiff, Bucaria assured Plaintiff that he would "get on the phone and make sure that it is done so you can proudly be the provider your family needs and I can feel better about you being properly compensated for the amazing job you have been doing for us thus far."

- Plaintiff was again not paid on the October 31, 2023 payday. Plaintiff emailed Defendant Bucaria and Audient partner Mark Spillane on October 31, 2023, once again seeking to find out why she hadn't been paid.  On October 31, 2023, Defendant Bucaria responded by email with the assurance that "I have a call today at 2pm w them to try to get this fixed.  I'll give you a call as soon as im[sic] off, hopefully with this being finally resolved."

- On November 7, 2023, Plaintiff yet again inquired to Bucaria about when she would finally be paid.   On November 15, 2023, Defendant RJ Bucaria told Plaintiff during a telephone call that Audient was in legal possession of "funds" that simply needed to

be transferred into the Audient payroll account, that the transfer would happen shortly, and that Plaintiff would be fully paid.

- After not having been paid on her November 15, 2023 payday, Plaintiff contacted Audient partner Mark Spillane.  Nearly a week later, after Plaintiff had received no response from Spillane, Plaintiff again contacted him on November 21, 2023.  Nine days later, on November 30, 2023, Mark Spillane finally responded to Plaintiff: "RJ asked me to reach out as he's offline for a while. Update on our pays—have the bank working on providing us access to funds next week."

- Plaintiff was not paid "next week" – or on any of the November or December 2023 paydays.  Even so, throughout November and December of 2023, Plaintiff continued her work as Audient's Director of Investor Relations, and in that capacity encountered Audient investors concerned that they, too, had not been receiving payments that were due to them.  The outside investors had received an explanation similar to what Plaintiff had been told by Defendant RJ Bucaria in November of 2023 in response to her inquiries about not being paid: that various "funding" had been transferred to Audient, but it was in an escrow account controlled by Audient's General Counsel.  Bucaria assured both the Audient investors and Plaintiff that the funds' release from escrow was imminent, and all would be fully paid, and soon.

- By January of 2024, Plaintiff had been working as Audient's Director of Investor Relations without pay for over three months. Then, on January 15, 2024—Plaintiff's payday—Defendant RJ Bucaria told Plaintiff via WhatsApp that the funding necessary to pay Plaintiff would arrive "tomorrow." However, Plaintiff was not paid on either the January 15 or the January 31, 2024 payday.

- Following the repeated promises from Bucaria that she would be paid imminently, on February 8, 2024, Plaintiff inquired by text with Bucaria about the timing of the payment owed to her. A week later, on February 15, 2024, Bucaria once again assured Plaintiff by text that she would be paid "tomorrow." Then, on February 20, 2024, Bucaria confirmed by text mesaage to Plaintiff that the funds necessary to pay Plaintiff had been transferred to Audient, but were in Audient's General Counsel's escrow account. The next day, a Wednesday, February 21, 2024, Bucaria assured Plaintiff that the funds would clear escrow and that she would be paid "tomorrow," a Thursday, or Friday at the latest. Thursday passed, as did Friday, and still not having been paid, Plaintiff inquired with Bucaria yet again on Monday, February 26, 2024. This time, Bucaria shifted his excuse from awaiting payment out of the escrow account to a purportedly imminent payment to Audient from an investor.

- March also passed without Plaintiff being paid, and then in a March 27, 2024 WhatsApp message, Bucaria yet again assured Plaintiff everything would be resolved "in the next day or so."

- Plaintiff was not paid throughout all of April of 2024.   Nor was Plaintiff paid on either  the May 1 or May 15, 2024 payday.

- In response to Plaintiff having expressed to him that her not being paid had caused her to be threatened with eviction, on May 24, 2024, Defendant Bucaria wrote a letter to Plaintiff's landlord, confirming her employment with Audient, the three-year term of her employment, that she was due $93,000 in pay, and that she would be paid on May 28, 2024.  The promised May 28, 2024 payment to Plaintiff was never made.  Plaintiff was forced to vacate her apartment.

### *Other Conduct Pertinent to RICO Allegations*

119.    In *Storyeller Production Co., LLC v. Audient*, No. 2-24-cv-01864 (C.D. Cal. filed May, 28, 2024), the plaintiff alleged that Bucaria and Audient had promised to make a $15.5 million investment in a film to be made by Steven Speilberg's production company.  When the promised investment from Audient didn't arrive, the plaintiff made multiple inquiries, and Bucaria invariably responded, as with Plaintiff, that the promised payment was imminent, and would be completed "tomorrow."  After months of Bucaria's evasions, the plaintiff first filed an arbitration against Audient, an arbitration that resulted in a $15.5 million award against Audient. When Audient showed no signs of paying the arbitration award, the plaintiff petitioned for an order confirming the arbitration award in the Central District of California.  Audient stipulated to

a judgment, but defaulted on that stipulation, and the *Storyteller* plaintiff is pursuing collection of the judgment.

120.     In *Apex Entertainment v. Audient Global Inves. Fund I, LP & Richard J. Bucaria*, (N.Y. Supr. Ct. No. 612247/2024), the plaintiff alleged that Audient and Bucaria had agreed to loan the plaintiff over $6 million to finance an Australian music festival.  The plaintiff paid considerable up-front loan fees to Audient, and in reliance on the loan extensively planned the music festival.  However, when the time came for the loan to be disbursed to the plaintiff, Audient and Bucaria once again delayed and deflected, ultimately never issuing the promised loan to the plaintiff while keeping the loan fees.  The case is still at the pleading stage in New York State court, with no Answer having yet been filed because RJ Bucaria has thus far evaded service.  A motion to deem Bucaria served by substitute services has been briefed and argued and a ruling on that motion is pending.

121.     In *Island Stars 21 Inc. v. Bucaria, et al.* (N.Y. Supr. Ct. No. 657063/21), the plaintiff corporation alleged that it had been defrauded by Bucaria through his infiltration of a company called Upsense Media Capital Pty. Ltd. ("Upsense"), and in connection with Audient's fraudulent promise to invest in a movie that is the subject of the *Storyteller* case.  Specifically, the plaintiff was promised a $500,000 return on a $1,000,000 investment, but the plaintiff received neither the promised $500,000 return nor its original $1,000,000 principal payment.  It is alleged that Bucaria and his co-defendants took the plaintiff's capital investment with no intention of making good on the parties' agreement.

122.     The Enterprise ran yet another similar scheme through Upsense as alleged in *Hudson Private Corp. v. Upsense, et al.* (L.A. Super. Ct. No 21-st-civ-1-3940), with Bucaria

having solicited a $2.5 million investment from the plaintiff with the false promise of a $1 million return. The *Hudson* plaintiff alleges that

> Bucaria utilizes Upsense to operate a fraudulent scheme (similar to a Ponzi scheme) whereby Bucaria lures potential investors into entering into various investment deals for ulterior and undisclosed purposes and then uses investment funds for improper purposes, including for his personal benefit and to repay prior financing parties, with no intention of actually performing on the promises made to the investors, including Hudson.

Hudson Compl., ¶ 6.

123.    Bucaria, Audient, and Spillane conducted themselves identically with the plaintiffs in the foregoing cases: falsely promising that owed payments, loans, and promised investments were imminent—"tomorrow," "next week," etc.—without ever having intended to make good on those promises.

124.    For instance, in the *Storyteller* action, the plaintiff describes being "strung along" by Bucaria, who "repeatedly represent[ed] that payment was just about to be made when, in fact, it was not." Amend. Petit. to Confirm Arb. Award, *Storyteller Production Co., LLC v. Audient Capital GP Ltd.*, No. 2:24-cv-01164, Doc. No. 11 (filed Mar. 6, 2024), ¶ 14.

125.    Moreover, the serial misrepresentations in the *Storyteller* case are part of a pattern extending to Plaintiff and other victims of Defendants' organized fraud:

- "When Storyteller inquired about the payment on September 8, 2022, RJ Bucaria, Audient Capital's managing General Partner, responded, 'Info received for the wire, I'll forward over to the fund admin to process and circle back with an ETA for you.'" *Id.* at ¶ 16.

- "When Storyteller checked back on September 20, 2022, Mr. Bucaria responded: 'Checked with our admin yesterday, capital call is out to the LP's and just waiting

for them to remit to the fund account.  My expectation would be **mid next week** wire will be ready to send to you.'" *Id*. at ¶ 16 (emphasis added).

- "Another follow-up on September 28, 2022 resulted in this response: 'Just circling back to you, admin has indicated they are still waiting on 2 LP''s to remit on their capital call and we will be all set.  I've asked for them to chase an ETA which I will of course share.'" *Id*. at ¶ 17.

- "When Storyteller followed up on October 11, 2022, Mr. Bucaria deflected yet again: 'We've connected with both LP's we had been waiting on, one has remitted their capital call already and the other is back from holiday next week and will be remitting as soon as he is back which will in turn have us wiring to you as soon as the funds clear the account.  I'll keep you abreast of what day to expect the wire on our end as we confirm the last LP's transfer day.'" *Id*. at ¶ 18.

- "When Storyteller inquired on November 3, 2022 about the payment status, Mr. Bucaria responded (on November 7): 'I've got a message into our fund administrator to check on the transfer status from our outstanding LP and will advise as soon as I hear back . . . Working to have the wire to you **by the end of the week**.'"  *Id*. at ¶ 19 (emphasis added).

- "On November 22, 2022, Mr. Bucaria provided an update: 'We've issued instructions to our admin for the wire, so it should process out **either tomorrow or Friday**.  Will confirm to you either way as soon as we receive the notice on our end that it has gone out.'"  *Id*. at ¶ 20 (emphasis added).

- "On February 1, 2023, Mr. Bucaria wrote: 'Apologies for the delay in responding. . . [T]he wire for December will go out on **Thursday next week**.'" *Id.* at ¶ 22 (emphasis added).

- "On March 2, 2023, Mark Spillane, Managing General Partner of Audient Capital interceded. He said: 'I have been briefed around this transaction and happy to provide further information as it comes to hand on our side. While it is unfortunate, we do understand that you need to lock picture and we confirm that we will forego onscreen credits if the funds have not arrived for you **by tomorrow** (US).'" *Id.* at ¶ 24 (emphasis added).

126.    The *Storyteller* petition concludes, "Suffice it to say that despite all these promises, excuses, and representations, Respondents have never made the [promised $15.5 million investment] or even a portion thereof." *Id.* at ¶ 29.

127.    An essentially identical pattern of deception is apparent in *Apex Entertainment v. Audient Global Inves. Fund I, LP & Richard J. Bucaria* (N.Y. Supr. Ct. No. 612247/2024), in which the plaintiff never received promised loan funds from Bucaria and Audient, while Bucaria and Audient retained all of the loan application fees made by the plaintiff. As with Plaintiff here, the *Apex* plaintiff was repeatedly told that payment was imminent:

- "Text message, dated March 29, 2024, from RJ Bucaria to Andrew McManus of Apex: 'Admin all done Andrew. Should be able to move funds across to escrow **tomorrow**.'" Compl. at ¶ 38 (emphasis added).

- "Email from RJ Bucaria, dated May 3, 2024: 'Just keeping you in the loop. Audient has moved funds to our attorney escrow and anticipate releasing wires out to Apex **on Monday**. . .'" *Id.* (emphasis added).

- "Text message, dated May 16, 2024, from R.J. Bucaria to Andrew McManus of Apex: 'Hey Andrew, looks like we're all set. Should have the transaction report **sometime tomorrow**. . .'" *Id*. (emphasis added).

128.    So, too, in *Island Stars 21 Inc. v. Bucaria, et al.* (N.Y. Supr. Ct. No. 657063/21) did Bucaria repeat the same pattern of false assurances, in this instance to investors who had been promised lavish returns on their investments through Bucaria, investments made in reliance on Audient's entirely fabricated investment in the film in the *Storyteller* action:

- Regarding a financial reporting that was among the obligations in *Island Stars*, Bucaria falsely gave the assurance that "I spoke with [a co-defendant] yesterday and he said he is expecting it [the required financial report] this week. He did say we are at break even **so there will be a check coming [y]our way in the next week or two as well**[.]" Compl. at ¶ 73 (emphasis added).

- Nearly three weeks later, Bucaria recycled essentially the same false assurance, promising that he would receive the long-promised financial reporting "today which means **I should have it to share with you by [Monday] or [Tuesday]**[.]" *Id*. (emphasis added).

- Five days later, the *Island Stars* plaintiff having still received neither the financial reporting nor the promised payment following from it, Bucaria told the plaintiff that he "should have the [financial] reporting **by tomorrow**." *Id*. (emphasis added).

129.    *Hudson Private Corp. v. Upsense, et al.* (L.A. Super. Ct. No 21-st-civ-1-3940) also alleges this same pattern of fraud by Bucaria, also in connection with Audient's phantom investment in the *Storyteller* film:

- On June 22, 2020, Bucaria informed the plaintiff that a contractually required financial report would be produced "**this week**."  Compl. at ¶ 26 (emphasis added).

- Weeks later, on July 13, 2020, Bucaria sent an email to the plaintiff claiming that he "should be getting some numbers from the studio **this week/beginning of next week**."  *Id*. (emphasis added).

- More than a month passed, and "[o]n August 18, 2020, Mr. Bucaria sent a text message to [the plaintiff] stating that the reporting for the Picture was with the escrow agent and should be received '**before the end of the week**.'  Bucaria provided no explanation in response to [Hudson's] inquiry as to why the escrow agent could not simply send the reporting directly to Hudson."  *Id*. (emphasis added).

- "On September 9, 2020, in response to yet another request by Hudson for the report allegedly in possession of the escrow agent, Bucaria promised to deliver the requested accounting which he was expected to receive '**this week**.'"  *Id*. (emphasis added).

- "On September 18, 2020, after Hudson's numerous efforts to obtain reporting and accounting information from defendants had failed, Hudson's counsel demanded that Upsense provide all financial and accounting information to protect Hudson's interests as an investor in the Picture.  Rather than complying with Hudson's requests, Upsense continued with its stonewall and delay tactics and refused to provide any information to Hudson."  *Id*.

130.    Despite involving greater financial complexity that Defendants' failure to pay Plaintiff's wages, the *Storyteller*, *Apex*, *Island Stars*, and *Hudson Partners* cases all exemplify the closely intertwined, fraudulent Enterprise alleged here.

131.    *Storyteller*—which has now twice been reduced to judgments, in arbitration and in the U.S. District Court for the Central District of California—reveals the foundation of the scheme and pattern of racketeering activity alleged here.  Defendant Bucaria and his co-conspirators pledged a $15.5 million investment to a film production, but without ever intending to make that investment.  Rather, by leveraging the documentation of the purported investment Defendant Bucaria and his co-conspirators lured in outside investors with promises of lavish, quick returns on their capital investments, never intending to pay out those investors' promised returns, or even their original capital investments.

132.    In every instance, Defendant Bucaria and his co-conspirators repeatedly promised that fulfillment of their obligations—whether investing in a motion picture or paying outside investors—would occur "tomorrow" or "next week."  These false assurances where knowingly false and exemplify the fraudulent nature of the racketeering Enterprise alleged herein.

133.    The model employed by Defendant Bucaria and his co-conspirators was identical even where the motion picture investment at issue in *Storyteller* was not implicated.  In *Apex*, for instance, Defendant Bucaria and his co-conspirators ran a fraudulent loan scheme, with the same false assurances, that loans would be paid out "tomorrow" or "next week."

134.    Additionally, seemingly integral to this scheme, was the persistent fabrication that the funds Defendant Bucaria and his co-conspirators were obligated to pay out were in their "attorney escrow."

135.     As part of the racketeering scheme alleged herein and operated by Defendant Bucaria and his co-conspirators, Plaintiff was hired by Defendants with promises to pay Plaintiff a salary, bonuses, and severance--promises that Defendants did not intend to fulfill, as in *Storyteller*, *Apex*, *Island Stars*, and *Hudson Partners*.

### Second Cause of Action—Against Defendants Audient and Bucaria (Breach of Written Contract/Reliance)

136.     Plaintiff hereby realleges and incorporates the allegations of each foregoing paragraph.

137.     Plaintiff entered into the Employment Agreement with Audient, pursuant to which Audient agreed to the following terms:

- a term of September 15, 2023 through September 14, 2026 (Empl. Agr. §2);

- a base salary of $120,000 (first year), $126,000 (second year), and $132,000 (third year) (Empl. Agr. §3(i)a-b);

- an annual bonus of 50% of base salary for the previously completed fiscal year, to be distributed within 60 days of December 31, irrespective of "whether or not the Employee is employed by at the time any such payments earned are actually paid" (Empl. Agr. §3(ii));

- a 10% Investor Relations Bonus in connection with Plaintiff generating management fees by introducing investors to Defendants Bucaria and Audient (Empl. Agr. §3(ii)); and,

- a three-month severance payment if Defendants unilaterally terminate Plaintiff's employment, payable to Plaintiff within 30 days of termination (Empl. Agr. §6(b).

138.    Plaintiff performed all of the conditions, promises, and covenants she was required to perform under the terms of the Employment Agreement, except those that Defendants excused or prevented Plaintiff from performing or that were waived by Defendants' misconduct.

139.    Defendants breached the Employment Agreement by failing to pay Plaintiff her salary, earned bonus, and contractually stipulated severance payment when Defendants terminated Plaintiff.

140.    Plaintiff has never excused any of Defendants' obligations under the Employment Agreement, nor has Plaintiff waived any of her rights and remedies against Defendants.

141.    As a direct result of Defendants' breaches of the Employment Agreement and Plaintiff's reasonable and justified reliance on Defendants' repeated promises to fulfill their obligations under the Employment Agreement, as set forth herein, Plaintiff has been damaged in an amount not less than $300,000, plus costs and attorneys' fees, as to Plaintiff's breach of contract claim.

142.    Defendants' breaches of the Employment Agreement were a substantial factor in and proximate cause of harm to Plaintiff.  Indeed, Defendants' flagrant and admitted breaches of the Employment Agreement are the sole cause of harm to Plaintiff in this regard.


### Third Cause of Action--Against Defendants Audient and Bucaria
### (Fraud – Intentional Misrepresentation and False Promise)

143.    Plaintiff hereby realleges and incorporates the allegations of each foregoing paragraph.

**144.**    On September 15, 2023, Plaintiff was hired by Audient as its Director of Investor Relations.

145.    On October 2, 2023, Audient formalized its employment relationship with Plaintiff by entering into the Employment Agreement (Exh. A).

146.    To induce Plaintiff to enter the Employment Agreement, Defendants Bucaria and Audient made material misrepresentations and false promises to Plaintiff, including:

- a term of September 15, 2023 through September 14, 2026 (Empl. Agr. §2);

- a base salary of $120,000 (first year), $126,000 (second year), and $132,000 (third year) (Empl. Agr. §3(i)a-b);

- an annual bonus of 50% of base salary for the previously completed fiscal year, to be distributed within 60 days of December 31, irrespective of "whether or not the Employee is employed by at the time any such payments earned are actually paid" (Empl. Agr. §3(ii));

- a 10% Investor Relations Bonus in connection with Plaintiff generating management fees by introducing investors to Defendants Bucaria and Audient (Empl. Agr. §3(ii));

- a three-month severance payment if Defendants unilaterally terminate Plaintiff's employment, payable to Plaintiff within 30 days of termination (Empl. Agr. §6(b); and,

- an arbitration clause whereby the parties agreed to arbitrate disputes before the Manhattan, New York office of the American Arbitration Association (Empl. Agr. §12).

147.    Defendants Bucaria and Audient made the foregoing promises knowing they were false at the time the Employment Agreement was entered into, with reckless disregard for the truth of the promises, and without the intention to perform.

148.    Defendants Bucaria and Audient intended for Plaintiff to rely on their representations and promises to induce Plaintiff to work for Audient.

149.    Plaintiff did in fact rely on Defendants' false promises, continuing to work for Audient over nearly a year, without pay, and amid a barrage of additional false promises that Plaintiff would be fully paid "tommorrow."

150.    Plaintiff was first due to be paid on September 30, 2023.  She was not.

151.    The next date on which Plaintiff was due to be paid was October 15, 2024. Again, Plaintiff was not paid by Audient.

152.    On October 19, 2023, and Plaintiff sent a lengthy email addressed to both Defendant Bucaria and Audient partner Mark Spillane, seeking further information concerning why she had not been paid now for two consecutive pay periods.

153.    In an October 19, 2023 email from Bucaria to Plaintiff, Bucaria assured Plaintiff that he would "get on the phone and make sure that it is done so you can proudly be the provider your family needs and I can feel better about you being properly compensated for the amazing job you have been doing for us thus far."

154.    However, Plaintiff was again not paid on her October 31, 2023 payday. Plaintiff emailed Defendant Bucaria and Audient partner Mark Spillane early on the morning of October 31, 2023, once again seeking to find out why she hadn't been paid.  On October 31, 2023, Defendant Bucaria responded by email with the assurance that "I have a call today at 2pm w

them to try to get this fixed.  I'll give you a call as soon as im[sic] off, hopefully with this being finally resolved."

155.    On November 7, 2023,  Plaintiff yet again inquired to Bucaria about when she would finally be paid.  On November 15, 2023, Bucaria told Plaintiff during a telephone call that Audient was in legal possession of "funds" that simply needed to be transferred into the Audient payroll account, that the transfer would happen shortly, and Plaintiff would be fully paid.

156.    After not having been paid on her November 15, 2023 payday, Plaintiff contacted Audient partner Mark Spillane.  Nearly a week later, after Plaintiff had received no response from Spillane, Plaintiff again contacted him on November 21, 2023.

157.    Nine days later, on November 30, 2023, Mark Spillane finally responded to Plaintiff: "RJ asked me to reach out as he's offline for a while. Update on our pays—have the bank working on providing us access to funds next week."

158.    Plaintiff was not paid "next week" – or on any of the four November or December 2023 paydays.

159.    Even so, throughout November and December of 2023, Plaintiff continued her work as Audient's Director of Investor Relations, and in that capacity encountered Audient investors concerned that they, too, had not been receiving payments that were due to them.  The outside investors had received an explanation similar to what Plaintiff had been told by Defendant RJ Bucaria in November of 2023 in response to her inquiries about not being paid: that various "funding" had been transferred to Audient, but it was in an escrow controlled by Audient's General Counsel.  Bucaria assured both the Audient investors and Plaintiff that the funds' release from escrow was imminent, and all would be fully paid, and soon.

160.    However, this ruse continued over many months, with neither the Audient investors being paid what they were owed nor Plaintiff being paid for her work pursuant to the Employment Agreement between her and Audient.

161.    By January of 2024, Plaintiff had been working as Audient's Director of Investor Relations without pay for over three months.

162.    Then, on January 15, 2024—Plaintiff's payday—Defendant RJ Bucaria told Plaintiff via WhatsApp that the funding necessary to pay Plaintiff would arrive "tomorrow."

163.    Plaintiff was not paid on either the January 15 or January 31, 2024 payday.

164.    Following repeated promises from Bucaria that she would be paid imminently, on February 8, 2024, Plaintiff inquired by text with Bucaria about the timing of the payment.

165.    A week later, on February 15, 2024, Bucaria once again assured Plaintiff by text that she would be paid "tomorrow."

166.    Then, on February 20, 2024, Bucaria informed Plaintiff by text message that the funds necessary to pay Plaintiff had been transferred to Audient, but were in Audient's General Counsel's escrow account.

167.    The next day, a Wednesday, February 21, 2024, Bucaria told Plaintiff that the funds would clear escrow and assured Plaintiff that she would be paid "tomorrow," a Thursday, or Friday at the latest

168.    Thursday passed, as did Friday, and still not having been paid, Plaintiff inquired with Bucaria yet again on Monday, February 26, 2024.  This time, Bucaria shifted his excuse from awaiting payment out of the escrow account to a purportedly imminent payment to Audient from an investor.

169.    However, Plaintiff was not paid throughout February of 2024, her fifth full month of not being paid by Audient.

170.    In a March 27, 2024 WhatsApp message, Bucaria yet again assured Plaintiff everything would be resolved "in the next day or so."

171.    Plaintiff was not paid on her March 31, 2024 payday.

172.    Nor was Plaintiff paid throughout all of April 2024.

173.    In response to Plaintiff having expressed to him that her not being paid had caused her to be threatened with eviction, on May 24, 2024, Defendant Bucaria wrote a letter to Plaintiff's landlord, confirming her employment with Audient, the three-year term of her employment, that she was due $93,000 in pay, and that she would be paid on May 28, 2024.

174.    The promised May 28, 2024 payment to Plaintiff was never made.  Plaintiff was forced to vacate her apartment.

175.    On learning that others similarly situated relative to Audient and Bucaria had no choice but to resort to litigation, Plaintiff did the same.

176.    Consistent with the arbitration clause in her Employment Agreement with Audient, Plaintiff filed an arbitration demand in the Manhattan office of the American Arbitration Association on July 10, 2024, paying all required fees.  Audient, however, altogether ignored the arbitration demand, and failed to pay its required fees.  Consequently, on July 25, 2024, the AAA dismissed the arbitration.

177.    As with other promises in the Employment Agreement, the arbitration clause was entered into by Defendants without the intention of abiding by it.

**Fourth Cause of Action—Against Defendant Bucaria**
**(Infliction of Emotional Distress)**

178.    Plaintiff hereby realleges and incorporates the allegations of each foregoing paragraph.

179.    Defendants engaged in outrageous conduct toward Plaintiff with the intention of causing, or with reckless disregard for causing, Plaintiff to suffer severe emotional distress.

180.    As a direct and proximate result of Defendants' conduct, Plaintiff has sustained and will continue to sustain serious psychological injuries, emotional distress, mental anguish, embarrassment, and humiliation.

181.    The acts herein to have been committed against Plaintiff were committed maliciously and oppressively, with the wrongful intention of injuring Plaintiff, entitling Plaintiff to recover punitive damages.


**Fifth Cause of Action—Against Defendants Audient and Bucaria**
**Unpaid Wages (N.Y. Lab. Law § 198)**

182.    Plaintiff hereby realleges and incorporates the allegations of each foregoing paragraph.

183.    Plaintiff was paid less than the wages she was owed as an employee of Defendant Audient, and consequently has a claim for unpaid wages under N.Y. Lab. Law § 198 1-a.

184.    Plaintiff hereby seeks a judgment ordering that Defendants pay Plaintiff the full amount of underpaid wages.

185.    Additionally, because Defendants can offer no good faith basis for having failed to pay Plaintiff at all over the nearly one year that she was employed by Defendants, Plaintiff is entitled to recover liquidated damages in the amount of 100% of Defendants' underpayment of wages to Plaintiff.

186.    N.Y. Lab. Law § 1981 4 also entitles Plaintiff to recover her attorneys fees and costs incurred in seeking and enforcing a judgment against Defendants for underpayment of wages to Plaintiff.

### Sixth Cause of Action—Against Defendants Audient and Bucaria
### (Wrongful Termination)

187.    Plaintiff hereby realleges and incorporates the allegations of each foregoing paragraph.

188.    Plaintiff was wrongfully terminated in retaliation for her having exercised her contractual right to arbitrate Audient's failure to pay her any wages or salary during the approximately one year that Plaintiff worked for Audient.

189.    From the outset of her employment, Defendants repeatedly assured Plaintiff that she would soon be paid.  These false assurances happened predominantly over approximately the first ten months of Plaintiff's employment, from September of 2023 through June of 2024.

190.    In addition to Defendants promising Plaintiff that she would be paid imminently, Defendant RJ Bucaria also wrote a May 21, 2024 letter to Plaintiff's property management company, with the assurance that Plaintiff would be fully paid (at least $93,000) presently and, therefore, Plaintiff would be able to pay her rent and avoid either eviction or being forced to abandon her rental home.

191.    Plaintiff was not paid, and was in fact forced to vacate her rented house.

192.    On June 25, 2024, pursuant to her Employment Agreement Plaintiff filed an arbitration demand with the American Arbitration Association against Defendants.  Defendants, however, failed to pay their required arbitration fee and the arbitration was dismissed.

193.    After Plaintiff filed her arbitration demand, Defendant Bucaria reacted with

considerable hostility to her having done so:



194.    Shortly thereafter, Plaintiff was terminated in retaliation for Plaintiff having

sought to enforce her Employment Agreement through arbitration.  Indeed, Defendants *only*

response to Plaintiff's arbitration demand was to wrongfully terminate Plaintiff because she

exercised her right to arbitration.


## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

a)  Awarding compensatory, direct, and consequential damages and pre-judgment interest in

an amount to be determined, but not less than $300,000;

b)  Awarding treble damages in an amount to be determined, but not less than $900,000;

c)  Awarding punitive damages in an amount to be determined, but not less than $3,000,000;

d)  Requiring Defendants to pay Plaintiff's attorneys' fees and costs;

e)  Requiring Defendants to pay statutory pre- and post-judgment interest; and,

49

f) Any further relief deemed appropriate by the Court.

## **JURY DEMAND**

Pursuant to Fed.R.Civ.P. R. 38(b), Plaintiff respectfully demands that this proceeding be

tried to a jury.

Dated: Staatsburg, NY
       January 8, 2024

**MOSS & BYRNES PLLC**

By:_____

Andrea Moss
MOSS & BYRNES PLLC
Attorneys for Plaintiff
187 Hollow Rd.
Staatsburg, NY 12580
